ANDRÉ BIROTTE, JR.
United States Attorney

SANDRA R. BROWN
Assistant United States Attorney
Chief, Tax Division
DARWIN THOMAS
Ca. Bar No. 80745
Assistant United States Attorney
Federal Building, Room 7211
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-2740
Facsimile:   (213) 894-0115
Email: darwin.thomas@usdoj.gov

BRIAN H. CORCORAN
Member, DC Bar, No. 456976
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 7238
Washington, D.C.  20044
Telephone: (202) 353-7421
Facsimile: (202) 514-6770
E-mail: brian.h.corcoran@usdoj.gov

Attorneys for Plaintiff, United States

IN THE UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) | Civil No. CV10-5856-JHN (PLAx) |
| GWENN WYCOFF, and FRANK OZAK, | ) ) ) ) ) | **Memorandum of Law in Support of Motion for Preliminary Injunction** |
| Defendants. | ) | |

4575123.1

## TABLE OF CONTENTS

**Preliminary Statement** ..................................................................................1

**Statement of Facts** ........................................................................................1

    **The Defendants and their Scheme** .................................................1

    **Dissemination of the Defendants' Scheme** ...............................3

    **The Art of Passing the Buck** ..................................................... 4

    **Specific Instances of Defendants' Illegal Conduct** ............................. 6

        1.    *The Kenzington Fund* ........................................................6

        2.    *The Anna Correy Family Trust* .........................................8

        3.    *The Serban Trusts* ..................................................... 10

    **Frivolous Lawsuits and Retaliatory Conduct** ...................................... 12

    **Harm to the Government** .................................................................. 14

**Argument** ...................................................................................... 14

**I.**    **A Preliminary Injunction Should Issue under IRC § 7408 to Prevent the Defendants From Further Violating §§ 6700 and/or 6701** ..................................................................... 16

**II.**   **An Injunction Should Issue Based Upon IRC § 7402 to Prevent Defendants from Engaging in Activities that Interfere with the Enforcement of the Internal Revenue Laws** ........................................ 21

**III.**  **An Injunction Will Not Infringe Upon the Defendants' First Amendment Rights** ........................................................... 23

**Conclusion** ....................................................................... 25

i

4575123.1

# TABLE OF AUTHORITIES

**CASES**

*Abdo v. United States,* 234 F. Supp. 2d 553 (M.D.N.C. 2002) .......................... 17

*Asseo v. Pan Am. Grain Co.*, 805 F.2d 23 (1st Cir.1986) ................................... 16

*Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983) .......................24-25

*Brody v. United States*, 243 F.2d 378 (1st Cir. 1957) ...........................................21

*Central Hudson Gas & Electric v. Public Serv. Comm'n*, 447 U.S. 557 (1980) ......................................................................................24

*Commodity Futures Trading Comm'n v. American Metal Exch. Corp.*, 693 F. Supp. 168 (D.N.J. 1988) .......................................................... 16

*Dunlop v. Davis*, 524 F.2d 1278 (5th Cir. 1975) .....................................................23

*Flynt Distribution Company, Inc. v. Harvey*, 734 F.2d 1389 (9th Cir. 1994) ................................................................................ 13

*Save our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005) ...............13,18

*S.E.C. v. Cherif*, 933 F.2d 403 (7th Cir.1991) ....................................................16

*United States v. Bell*, 414 F.3d 474 (3rd Cir. 2005) .............................................24

*United States v. Buttorff*, 761 F.2d 1056 (5th Cir. 1985) ........................15, 18, 20

*United States v. James DiLullo*, No. 2:07-cv-00321 (D. Nev. Nov. 8, 2007) ........................................................................................7

*United States v. Estate Preservation Services*, 202 F.3d 817 (9th Cir. 2000)  ...............................................................15,17-18, 20

*United States v. Ernst & Whitney*, 735 F.2d 1296 (11th Cir. 1984) ...................21

*United States v. Fisher*, No. Civ. 3:03-CV-2108G, 2004 WL 489822 (N.D. Tex. Jan. 26, 2004) .................................................................................20

*United States v. Hempfling,* No. CV F 05-0594 LJO SMS, 2008 WL 703809 (E.D. Cal. March 13, 2008) ...............................................................................21

*United States v. Kaun,* 827 F.2d 1144 (7th Cir. 1987) .....................15, 17-18, 21

*United States v. Lee*, 455 U.S. 252  (1982) .......................................................23

*United States v. O'Brien*, 836 F. Supp. 438 (S.D. Ohio 1993) ..........................16

4575123.1

*United States v. Ratfield*, No. 01-8816-CIV-MARRA, 2004 WL 3174420 (S.D. Fla. Nov. 30, 2004) ...............................................................................20

*United States v. Schiff*, 379 F.3d 621 (9th Cir. 2004) .............................. 15, 24-25

*United States v. White*, 769 F.2d 511, 515 (8th Cir. 1985) .................................15

*University of Tex. v. Camenisch*, 451 U.S. 390 (1981) ......................................16

**FEDERAL STATUTES**

26 U.S. C § 6700......................................................................................14-18

26 U.S. C § 6701......................................................................................14-18

26 U.S.C. § 7402(a) .......................................................................1-2, 15, 21-22

26 U.S.C. § 7408 .............................................................................1-2, 14-17, 21

**OTHER AUTHORITIES**

11A C. Wright & A. Miller, *Federal Practice and Procedure* § 2949 (2d ed.1995) ...........................................................................................16

4575123.1

The United States, for its motion for a preliminary injunction pursuant to 26 U.S.C. ("I.R.C.") §§ 7402 and 7408 against Defendants Gwenn Wycoff and Frank Ozak, respectfully states as follows:

## PRELIMINARY STATEMENT

For several years, Wycoff and Ozak have been advising individuals about the benefits of establishing sham "common-law" trusts, which they falsely claim will allow their customers to avoid the payment of federal taxes due. The trusts they help create (and in many cases directly assist in operating) purport to hold their creators' personal as well as business assets, so that the resulting trusts, rather than their creator, "own" those assets, thus reducing if not eliminating entirely the creator's federal tax liabilities. (*See* Declaration of Susan Lee ("Lee Decl.")[1], a true copy of which is attached as Exhibit A, at ¶ 5).

In fact, however, these sham trusts are simply the linchpin of an elaborate scheme to evade the payment of federal income taxes. As a result of the Defendants' false statements and conduct, the Government has been repeatedly deprived of tax revenue. The United States accordingly seeks under Sections 7402 and 7408 of the Internal Revenue Code to preliminarily enjoin Wycoff and Ozak from continuing to promote, and assist in the creation and operation of, these sham common-law trusts.

## STATEMENT OF FACTS

### The Defendants and their Scheme

Gwenn Wycoff is a resident of Los Angeles, California, and currently lives with Ozak. Wycoff is a trust administrator and/or protector for several of the abusive trusts described in more detail herein, as well as the impetus behind their establishment.

---

1. All references in this memorandum of law to witness declarations shall utilize the abbreviation "_____ Decl."

1

4575123.1

Frank Ozak, a purported attorney, lists himself as a general manager of the Kenzington Fund - a trust much like those the Defendants create for others, and through which the Defendants have in the past promoted their illegal activities.

There is a yawning gulf between a valid trust and the sham "common law" trusts promoted by the Defendants. In a valid trust, legal title to property is conveyed to an independent trustee, who is then responsible for utilizing that property for the benefit of another person (the beneficiary). The beneficiary lacks legal title and exercises no control over trust operations but enjoys benefits of ownership (*e.g.* income earned from trust assets). The federal tax laws recognize numerous types of legal trust arrangements commonly used for estate planning, charitable purposes, and holding of assets for beneficiaries. (*See* "Abusive Trust Tax Evasion Schemes", http://www.irs.gov/businesses/small/article/0,,id=106538,00.html). However, if the owner of property transferred to a trust continues to retain an economic interest in or control over that property, the owner is treated for income tax purposes as the owner of the trust property, and transactions involving that property are properly taxed to the owner. *See* I.R.C. § 671 *et seq.* The Defendants promote the idea that "common law" trusts are beyond the Government's power to tax because they arise as a matter of contract. They thus inform customers that they can "own nothing," but "control everything" by placing their personal and business assets in such trusts, continuing to control them despite the existence of the supposedly "independent" trustees. And the trusts can in turn also evade taxation by distributing away all of their income.

Wycoff and Ozak promote not merely the concept of common-law trusts, but actively assist their customers in their creation, then management, playing administrative roles in their subsequent operation (through which they are able to derive lucrative fees). Once a customer expresses interest in retaining Wycoff and Ozak's services, the Defendants begin by preparing the underlying trust documents.

2

4575123.1

Those documents call for the appointment of trustees to assist in the trust's subsequent operation (although, as discussed below, the trust grantor continues to play the dominant role in managing trust affairs). The Defendants also help open bank accounts used to pay the customer/taxpayer's expenses and bills, both for personal and business purposes. Thereafter, when that individual's business performs services or sells goods, he arranges for payments to be made directly to the trust, and the trustee merely writes a check back to the grantor as his salary. The Defendants' Customers are also typically paid some salary by the trusts (in addition to the trustees themselves). Wycoff and Ozak falsely tell their customers that this arrangement is beneficial from a tax standpoint, because, they claim, individuals need not pay tax on income that is paid directly to their trust. (Lee Decl. ¶¶ 5-7).

Wycoff and Ozak also arrange - through third parties - the preparation of Form 1041 income tax returns for the trusts they help create. Such tax returns claim the grantor's salary and other amounts as deductions. The returns also frequently purport that they have distributed all trust income - invariably, in virtually-untraceable transactions to other fictitious trust entities. When examined closely, however, the distribution reported on such trust returns cannot be verified. (Lee Decl. ¶8).

### Dissemination of the Defendants' Scheme

Wycoff and Ozak initially promoted their tax scheme via the website "www.kenzington.com" (the name of which relates to their own trust, the "Kenzington Fund" (discussed in detail below)). In 2004, however, after they became aware of the IRS's investigation into their activities, they shut that website down and began using another website, "www.passingbucks.com" to promote their fraudulent advice and products. (Lee Decl. ¶ 13). That website is connected to both Defendants - the registered owner of the passingbucks.com website is George

3

4575123.1

McCalip, a close associate of the Defendants who also acts as the Kenzington Fund trustee.  (*Id.; see also* Ex. 1 to Lee Decl.)

On both the Kenzington and "passingbucks" websites, Wycoff and Ozak have offered for sale numerous printed materials that promoted their trust-creation scheme. For example, the Kenzington website sold a newsletter, a report, and common law trust books.  Posted on that website was an article entitled "Give It Away and Get It" written by Wycoff, as well as another article entitled "Own Nothing, Control Everything."  (Lee Decl. ¶ 15; *see also* Ex. 5 to Lee Decl.)  Ozak and Wycoff have also attended dinners and other gatherings where they have made presentations to prospective customers to encourage them to participate in the trust scheme.  In June of 2009, for example, Ozak made a presentation at the Karl Hess Club, a Los Angeles-based libertarian organization, and discussed the advice contained in the publications they offer for sale. (Lee Decl. ¶ 14; *see also* Ex. 4 to Lee Decl.)

### The Art of Passing the Buck

In 2008, Ozak and Wycoff published a two-volume work entitled The Art of Passing the Buck, which contains numerous glaringly false statements about the internal revenue laws. Wycoff and Ozak advise customers to purchase these materials to obtain more information about the trust scheme they advocate.  Wycoff and Ozak offer these publications for sale on the website as well as at seminars and discussions at which they speak; it has also been promoted on a radio show in 2008 by their associate Mr. McCalip.   The first volume costs $39.95, with the second (which contains more detailed instructions for how to establish and make use of the trusts advocated by Wycoff and Ozak) going up in price to $500.  (Lee Decl. ¶ 16)

The purported "author" of The Art of Passing the Buck volumes is Charles Arthur, but Mr. Arthur does not exist. The volumes were in fact written under that pseudonym by a "consortium" of individuals, including Wycoff, Ozak, and McCalip.

4575123.1

Ozak is the general manager of "Charles Arthur Enterprises," the volumes' publisher. (Ex. 4 to Lee Decl.)

The Art of Passing The Buck, a self-published work, is strewn with unexplained asides and discussions of the sorts of topics beloved by conspiratorially-minded tax defiers (for example, the assertion that the U.S. Federal Reserve Bank is a "private central bank which looks governmental but is not"). (*See* Excerpts from The Art of Passing the Buck, attached hereto as Exhibit B, at Vol. I, p. 54). But the persistent message contained in the two volumes is that there are enormous benefits for those clever enough to seize upon and use common-law trusts. The "secret" of such trusts, Wycoff and Ozak assert, constitutes "lost" knowledge known mainly to the rich (as well as, conveniently for the reader, Wycoff and Ozak), but which can be advantageously used by those willing to learn (mainly by paying the hundreds of dollars charged by the Defendants to purchase both volumes).

The Art of Passing the Buck repeatedly sets forth the false assertion that taxpayers may establish trusts for their personal and business assets and may continue to control those assets, yet avoid tax liability arising out of the use of those assets. (*Id.* at Vol. II, p. 24 ("[a]s outlined in Volume I, Grantors may retain significant control within the Trust although the Trustees own the assets . . . This provision is uncommon in statutory trusts. We believe this is because the information has been obscured.")). Both volumes are replete with advice about how adoption of their trusts "offers, among all the Trust types, the best combination of asset protection, for . . . tax minimization." (Ex. B at Vol. I, p. xiii).

These two publications also contain numerous examples of the Defendants' frivolous views about the federal tax laws. For example, one section of The Art of Passing the Buck is devoted to rebutting the factors the IRS considers in determining whether a trust is a sham, relying on common frivolous tax-defier arguments to do so.

5

4575123.1

(*See, e.g.,* Ex. B - Vol. II, p. 159 ("Chapter 15: Head Scratchers")). Elsewhere, Wycoff and Ozak boldly assert that the IRS's interpretation of the law on the taxability of trusts is simply incorrect and may therefore be disregarded. (*See, e.g.,* Ex. B, Vol. II, pp. 159-161).

The Art of Passing the Buck volumes also contain numerous other facially incorrect statements about the IRS and the legal basis for its investigations into taxpayer conduct (such as the assertion that the IRS "is a foreign organization, based in Puerto Rico, and not part of the U.S. Government," the IRS has no authority to collect money, and that federal agents have no jurisdiction over common-law trusts (Ex B., Vol. II, at pp. 204-205)).  At bottom, however, The Art of Passing the Buck exists to provide the road map for the creation of the trusts through which Wycoff and Ozak's customers attempt to understate their tax liabilities.  In this regard, the two volumes serve as a means by which Wycoff and Ozak can generate business for themselves as well beyond the profits derived from their sale – and to that end include an offer to contact "Charles Arthur Enterprises" to obtain consulting assistance in the creation and management of a trust.  (Lee Decl. ¶¶ 17-18 and Ex. 6 attached thereto).

### Specific Instances of Defendants' Illegal Conduct[2]

*1.      The Kenzington Fund*

The Defendants created their own personal sham trust, the "Kenzington Fund," to assist them individually in the same tax evasion conduct they promote to others. Wycoff and Ozak established the Kenzington Fund trust in 1997.  Wycoff is currently

---

2.  The Declaration of Revenue Agent Thomas Cheung (Exhibit D) also contains a discussion of the Sterling Paladin Family Trust, yet another trust formed by the Defendants that exhibits the same tax-evading characteristics as the other trusts discussed herein.  (Cheung Decl. ¶¶ 18-26).

4575123.1

the administrator and secretary of the Kenzington Fund, Ozak its general manager, and George McCalip its trustee. (Lee Decl. ¶ 10).

The Kenzington Fund (like its creators) is associated with other known promoters of tax evasion schemes. Its 2003 Form 1041 tax return identified its fiduciary as Noble Trust Services Co., P.O. Box F-42498, Freeport, Bahamas, and the fund's beneficiary as Equity Management Trust ("EMT") c/o Noble Trust Services Co., P.O. Box F-42498, Freeport, Bahamas. (*See* Exhibit 2 to Lee Decl.). EMT and Noble Trust Services Co. were vehicles through which James A. DiLullo, another promoter of tax-evasion schemes, was known to conduct business from the State of Nevada. Mr. DiLullo, however, has been permanently enjoined from promoting tax-evasion schemes based upon fraudulent trusts in 2007, and is currently the subject of a bench warrant for his arrest for violating the terms of his injunction. *See generally United States v. James DiLullo*, No. 2:07-cv-00321 (D. Nev. Nov. 8, 2007) (order granting permanent injunction).

Since its creation, the Kenzington Fund has routinely failed to file required federal tax forms and pay taxes due. It last filed a Form 1041 trust income tax return in 2003, which the IRS audited. That return reported income of $95,246.00 and an offsetting distribution deduction of $95,246.00, purportedly distributed out to EMT. (Lee Decl. ¶ 12). By virtue of this claimed deduction, the Kenzington Fund reported no taxable income, even though the audit established either that claimed distributions of trust income were fictitious or simply could not be verified. Based in part on that determination, the IRS made a jeopardy assessment against it of $56,734. (Ex. 3 to Lee Decl.). As of April 30, 2010, the Kenzington Fund owes unpaid taxes, plus penalties and interest, in the amount of $105,142.

4575123.1

### 2. *The Anna Correy Family Trust*

In 2003, Dean "Rex" Wilson was persuaded by the Defendants to create a trust after he saw an advertisement published by Wycoff and Ozak in a magazine stating that it was possible for trust grantors to "own nothing, control everything." (Declaration of Rex Wilson, a true copy of which is attached as Exhibit C, at ¶ 3). After meeting in person with the Defendants, the Defendants helped Wilson create the Anna Correy Family trust and two other related trusts, into which Wilson transferred all of his business and personal assets; Wycoff and Ozak prepared the trust documents, created trust bank accounts, and did other work to set up Wilson's trusts, each of which handled a different aspect of his business or personal assets. (Wilson Decl. ¶¶ 5-7). Wilson also agreed that Ozak and Wycoff would serve as trustees.

Wycoff and Ozak informed Wilson that he would realize tax advantages from the creation of these trusts. (Wilson Decl. ¶3). Prior to the creation of the trust, Wilson had reported the income he derived from his business practices on a Schedule C appended to his personal Form 1040 income tax return. (Declaration of Thomas Cheung, a true copy of which is attached as Exhibit D, at ¶ 5). Once the trusts had been created, however, all income and expenses reported in connection with Wilson's business were reported on fiduciary income tax returns (Forms 1041) filed by the "Anna Correy Family Trust," even though Wilson himself continued to operate his business. (Cheung Decl. ¶ 7) Wilson was that trust's general manager. After 2003, Wilson ceased filing a personal Form 1040 income tax return, and thus did not report his own salary or income derived from his business activities.

After setting up the trusts for Wilson, the Defendants had exclusive access to the trusts' bank accounts and used deposited money to pay trust expenses (such as bills relating to Wilson's business) as well as their own fees. (Wilson Decl. ¶¶7-8). The Trust paid Wilson a monthly salary, and if he needed any additional money, he

4575123.1

merely took out a purported "loan" from the trust. (Cheung Decl. ¶ 9, Wilson Decl. ¶ 6). Wycoff and Ozak also used money deposited with the trust to make at least two investments that they later informed Wilson had been so unsuccessful that the sum of the investments was completely lost. Wilson has informed the IRS that he was unable to recover these lost investment sums from the Defendants. (Wilson Decl. ¶ 10).

In keeping with the fiction that the Anna Correy Family Trust was now operating the business, Wilson submitted payments he received from customers to the trust. But there is no doubt that Wilson, and not the Defendants, was running his business, and determining what expenses needed to be satisfied. Indeed, Wilson initially continued to pay business expenses himself, albeit on trust bank account checks that had been pre-signed by the Defendants. (*Id.* ).

Wycoff and Ozak informed Wilson that they would arrange for the preparation of the trust's tax returns. (Wilson Decl. ¶ 9). Even though there was no return preparer information disclosed on the trust's tax return, the IRS has determined that James DiLullo (the individual discussed above who has been permanently enjoined for his own promotion of tax-fraud schemes) in fact prepared the trusts' income tax returns. (Cheung Decl. ¶¶ 11-12). Wilson had never seen, nor had he signed, the tax returns Wycoff and Ozak arranged to have prepared. Indeed, he only learned that the IRS had opened an audit to investigate the trust's tax liability after being served with an IRS summons. (Wilson Decl. ¶¶ 11, 14).

Beginning in 2008, the IRS audited the Anna Correy Family Trust income tax returns for the 2005-2007 tax years. (Cheung Decl. ¶ 4). In so doing, it discovered that the trust tax returns all contained false deductions offsetting all of the reported trust income and reported zero overall tax liability. (*Id.* ¶ 14). The returns that had been filed for the "Anna Correy Family Trust" reported the income and expenses of Wilson's business (Natural Ways Systems) activity, but claimed to have distributed

9

4575123.1

all such income to EMT, the purported beneficiary of the trust, as well as other trusts created by Ozak and Wycoff. (As noted above, EMT was also a designated beneficiary of the Defendants' Kenzington Fund trust and is connected to DiLullo). (Cheung Decl. ¶ 15). The IRS accordingly determined that the related trusts established for Wilson should be disregarded for tax purposes. As a result, Wilson's income was adjusted to be that of the gross income of the business purportedly operated by the trust. The IRS recalculated Wilson's actual tax liability, determining that he owed $48,834 in unpaid taxes plus penalties and interest, and Wilson agreed to the determination. (Cheung Decl. ¶¶16-17, Wilson Decl. ¶¶ 14-15).

### 3.    The Serban Trusts

For a fee, Wycoff and Ozak helped Rita and George Serban of Bakersfield, California set up three related trusts: the Solomon Nabres Family Trust, the Solomon Family Trust, and the Hagar Family Trust (collectively, the "Serban Trusts"). (Declaration of Fred Chynoweth, a true copy of which is attached as Exhibit E, at ¶ 4; Declaration of George Serban, a true copy of which is attached as Exhibit F, at ¶ 5). Once the trusts were established, the Serbans placed their income and assets relating to their business into the trusts. These trusts in turn purportedly invested the monies, maintained the assets and properties they held, and made distributions of their income to both Serban family members as well as other beneficiaries. (Chynoweth Decl. ¶¶ 5-6; Serban Decl. ¶ 7). Although trustees were appointed to manage the trust businesses, the Serbans occupied managerial and executive roles within the trusts. (Serban Decl. ¶ 8; Chynoweth Decl. ¶¶ 4, 6).

Wycoff and Ozak played active roles in the operation of the Serban Trusts. The Defendants attended quarterly and yearly trustee meetings of each trust, and were compensated for this involvement. (Chynoweth Decl. ¶ 6 and Ex. A attached thereto; Serban Decl. ¶ 10). The Defendants also assisted in the preparation of the Serban

4575123.1

Trusts' tax returns - in particular, by recommending to the Serbans' CPA that they use James DiLullo to assist them with the tax returns for the trusts. (Chynoweth Decl. ¶ 7). And they provided information to the Serbans about how DiLullo might be able to advise them as to good investments for the trusts's assets. (Serban Decl. ¶ 12).

Despite the superficial appearance of the Serban Trusts' independence, George and Rita Serban personally had significant control at all times over their trusts' activities, including but not limited to check signing authority, management of trust operations, travel to and personal attendance at all trustee meetings, and direction of the disposition of trust income, including investment decisions. (Serban Decl. ¶¶ 4, 7, 11; Chynoweth Decl. ¶ 10). The Serbans vetoed the Defendants' recommendation that they invest trust income in a DiLullo-related opportunity. (Serban Decl. ¶ 12). All of the above was consistent with the Defendants' claims, in The Art of Passing the Buck and elsewhere, that the common-law trusts they promoted allowed their customers to continue to "control everything."

As with the other trusts created at the urging of the Defendants, the IRS learned through its investigation of the Serbans that the trusts were sham entities. Many of the Serban Trust beneficiaries proved to be fictitious entities the existence of which could not be verified (Chynoweth Decl. ¶¶ 7, 11 ). The tax returns prepared for the Serban Trusts often did not reflect accurately how the trust indentures specified that certain matters should be managed. (Id. ¶ 12). Nor could the IRS reconcile the manner in which (based upon trust income tax returns) income was actually distributed by the Serban Trusts. (Id. at ¶¶ 13-14).

The Serbans themselves found over time that much of the advice they were receiving from Wycoff and Ozak seemed suspect. The Serbans, for example, could not verify how trust proceeds were distributed (Serban Decl. ¶ 13). The Defendants also misrepresented to the Serbans that their trusts could legally report, in K-1 filings,

11

4575123.1

that they had made financial disbursements to certain trust beneficiaries or entities without in fact making actual distributions to those entities.  In particular, the Serbans were told by the Defendants that they could distribute to  DiLullo (who was at one point a designated beneficiary of one of the trusts) a small percentage of the sum reported on a K-1 as having been distributed to him.  (*Id*. ¶ 14).

After an IRS audit of the Serbans' tax liabilities for years 2001 to 2005, George and Rita Serban agreed to tax deficiencies and penalties in excess of $900,000. (Chynoweth Decl. ¶ 15, Serban Decl. ¶ 17).  The Serbans subsequently dissolved their trusts, greatly disappointed that they had been so misled by Wycoff and Ozak. (Serban Dec. ¶ 18).

### Frivolous Lawsuits and Retaliatory Conduct

In tandem with their promotion of common-law sham trusts, the Defendants have brazenly resisted the IRS's efforts to investigate their conduct.  For example, in 2004, in connection with an IRS audit of the Kenzington Fund's 2003 tax return, Revenue Agent Susan Lee issued an administrative summons to Alliance Bank requesting the Kenzington Fund's bank records.  In response, Wycoff first attempted to deny the Government's ability to investigate her, by asserting incredibly that, for tax purposes she was an "exempt foreign person." (Lee Decl. ¶ 20)  Wycoff subsequently filed a frivolous lawsuit seeking personal damages and an injunction against Revenue Agent Lee.  The lawsuit was eventually dismissed, but only after the Government had expended unnecessary time and resources in addressing the groundless claims asserted in the action.  The Defendants' close associate, McCalip, engaged in equally improper tactics against Revenue Agent Lee in 2005, in response to similar investigative efforts by the IRS.  (*Id.* ¶¶ 21-22).

Wycoff and Ozak similarly advise their customers how to obstruct governmental investigative efforts.  In particular, the Defendants have stated (in The

12

4575123.1

Art of Passing the Buck and elsewhere) that the grantors of trusts should draft trust documents creating an "Oath of Privacy." They purport, falsely, that this oath allows persons with knowledge of trust affairs to refuse to provide information about the trusts to federal agents and other government personnel. (Lee Decl. ¶ 21; *see also* Ex. B, Vol. II, p. 203). The Serbans specifically included such an "oath" in their trust documents. (Serban Decl. ¶ 9; *see also* January 30, 1999 Minutes of the Meeting of Solomon Nabres Family Trust, a true copy of which is attached as Exhibit G). These provisions often provided for significant penalties - in the thousands, or even hundreds of thousands of dollars - if violated, the intent being not only to discourage breach of the "oath" but also to provide customers with a ready (albeit ridiculous) excuse for refusing to comply with any Government investigation of a trust. Trust creators like Rex Wilson were not even aware until after the fact that they had agreed to such large penalties if the oath were to be breached. (Wilson Decl. ¶ 13).

The Art of Passing the Buck is itself replete with examples of the Defendants urging their customers to resist legitimate IRS investigations, claiming that they will only be tricked by the Government if they cooperate, and that only trustees (more often than not, Wycoff and Ozak) should "deal with agency officials." (Ex. B at Vol. II, p. 204). And Wycoff and Ozak have personally guided their customers in how to successfully interfere with IRS investigations. When the Serbans learned their trusts were being audited, for example, they were initially instructed by Wycoff and Ozak to resist, and to that end were referred to David Manning, a legal assistant and purported "self-taught expert" in dealing with IRS investigations, for assistance. (Serban Decl. ¶¶ 15-16). The Serbans paid Manning approximately $40,000 to engage in a letter-writing campaign characterized by the same types of frivolous arguments that Wycoff and Ozak themselves hurled at the Government when they were served with administrative summonses (*Id.*, Chynoweth Decl. ¶ 9). The Serbans

13

4575123.1

soon determined, however, that the course of conduct urged upon them was counter-productive, and they eventually abandoned Manning in favor of retaining the services of an attorney competent to help them solve their problems.  (Serban Decl. ¶16).

At the same time that Wycoff and Ozak instruct their customers to evade handling IRS inquiries directly, they also endeavor to keep trust creators and their beneficiaries ignorant of trust business.  Indeed, some trust creators, like the Serbans, could not understand what the trusts were doing or why.  Rex Wilson, grantor of the Anna Correy Family Trust, did not even know the trust tax returns were being audited until he was served with an IRS summons - and was never provided copies of his trusts' tax returns prior to that time.  (Wilson Decl. ¶¶ 9, 11).

**Harm to the Government**

The overall impact of Wycoff and Ozak's conduct has been to deprive the federal government of tax revenue it is owed.  As Revenue Agent Lee's declaration states, over the past six years the IRS has completed audits of the tax returns of four trusts created by, or with the assistance of, Ozak and Wycoff, including their own Kenzington Fund trust return.  (Lee Decl. ¶ 23).  In all such cases, the IRS has either formally determined that the trust at issue was a sham and that the underlying taxpayer owed additional income taxes, or reached a settlement in which the taxpayer connected with the audited trust agreed to additional unpaid taxes.  As of April 30, 2010 the total amount of tax deficiencies assessed in these four cases resulting from Wycoff and Ozak's promotion of the common-law trusts is $1,192,212.  (*Id*. ¶¶ 23-24).  And there are still more pending audits of trusts created by or at the instigation of the Defendants, the results of which are anticipated to be the same.

**ARGUMENT**

Under 26 U.S.C. § 7408, courts may enjoin persons who have engaged in conduct subject to penalty under 26 U.S.C. §§ 6700 and/or 6701, *i.e.* where an

4575123.1

individual is promoting the adoption of abusive tax schemes as defined in those statutes. And under 26 U.S.C. § 7402(a), courts may enjoin federal tax return preparers "as may be necessary and appropriate for the enforcement of the internal revenue laws."

Because this Court's authority to grant such injunctive relief explicitly arises as a matter of statute, the elements that usually must be satisfied to obtain the equitable remedy of an injunction (*e.g.,* irreparable harm, or likelihood of success on the merits) in most contexts are inapplicable. *United States v. Schiff*, 379 F.3d 621, 625 (9th Cir. 2004)(observing that district courts "use a specialized standard" in reviewing preliminary injunctions sought under Section 7408); *United States v. Kaun,* 827 F.2d 1144, 1148 (7th Cir. 1987) ("[i]n an action for a statutory injunction, once a violation has been demonstrated, the moving party need only show that there is a reasonable likelihood of future violations in order to obtain relief"); *see also United States v. Estate Preservation Services,* 202 F.3d 1093, 1098 (9th Cir. 2000). Given the above, all the Government need do herein is prove that the Defendants engaged in conduct subject to penalty under the relevant portions of the Tax Code, and that injunctive relief is therefore appropriate to prevent the otherwise likely recurrence of that conduct. *Estate Preservation Services,* 202 F.3d at 1097 (a finding of § 7408 violation sufficient to enjoin abusive tax-shelter promoter); *United States v. Buttorff,* 761 F.2d 1056, 1059 (5th Cir.1985) (same); *United States v. White*, 769 F.2d 511, 515 (8th Cir. 1985)(same).

The Supreme Court has recognized that "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Accordingly, the Federal Rules of Evidence do not apply to preliminary injunction hearings in general. *See S.E.C. v. Cherif*, 933 F.2d 403, 412 n. 8 (7th

15

4575123.1

Cir.1991); *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 25-26 (1st Cir.1986); *United States v. O'Brien*, 836 F. Supp. 438, 441 (S.D. Ohio 1993); *Commodity Futures Trading Comm'n v. American Metal Exch. Corp.*, 693 F. Supp. 168, 173 (D.N.J.1988). This Court may consider what would, in other circumstances, be considered inadmissible evidence in deciding whether to grant the preliminary injunctive relief sought in the Government's motion. *See Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984); *see also* 11A C. Wright & A. Miller, *Federal Practice and Procedure* § 2949 (2d ed.1995) ( "it is not surprising that in practice affidavits usually are accepted on a preliminary injunction motion without regard to the strict standards of Rule 56(e), and that hearsay evidence also may be considered ").

**I. A Preliminary Injunction Should Issue under IRC § 7408 to Prevent the Defendants From Further Violating §§ 6700 and/or 6701**

This Court is authorized under I.R.C. Section 7408 to enjoin persons who have engaged in any conduct subject to penalty under Sections 6700 and/or 6701 [3/], where the Court also finds that injunctive relief is appropriate to prevent recurrence of such

---

3. Section 6700 imposes penalties on any person who: (1) organized or sold, or participated in the organization or sale of, an entity, plan, or arrangement; (2) in connection therewith made or caused to be made false or fraudulent statements concerning the tax benefits to be derived from the entity, plan, or arrangement; (3) knew or had reason to know that the statements were false or fraudulent; and (4) the false or fraudulent statements pertained to a material matter. 26 I.R.C. § 6700(a).

Section 6701 imposes a penalty on any person who (1) "aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return, affidavit, claim, or other document," (2) "knows (or has reason to believe) that such portion will be used in connection with any material matter arising under the internal revenue laws," and (3) "knows that such portion (if so used) would result in an understatement of the liability for tax of another person." I.R.C. § 6701(a).

4575123.1

conduct. I.R.C. § 7408(b); *Estate Preservation Services,* 202 F.3d at 1098; *see also Abdo v. United States,* 234 F. Supp. 2d 553, 565 (M.D.N.C. 2002)(*citing Kaun*, 827 F.2d at 1149-50).   The Government must merely prove these factors by a preponderance of the evidence. *Estate Preservation Services*, 202 F.3d at 1098.

Here, the Defendants have engaged in conduct violative of both Sections 6700 and 6701.   Through the statements on their website, the contents of The Art of Passing the Buck, and the many pieces of advice and guidance the Defendants offered their customers, Wycoff and Ozak promote, for a fee, the creation of sham common-law trusts, falsely describing the purported tax benefits of such trusts.  The promotion of these trusts is dependent on the Defendants' false and/or fraudulent representations to their customers that creation of such trusts will allow a customer to "own nothing" but "control everything," and thereby eliminate the customer's tax liabilities by making it appear as if that the customer has no taxable income - even when the customer's income is derived from his own existing economic activity.  Acting upon the Defendants' assertions, such customers subsequently file income tax returns in which they purport falsely to owe little to no taxes.

Next, Wycoff and Ozak knew or had reason to know that the statements they have made about these trusts are false, especially given the extent to which the trusts and their tax returns have been the subject of adverse action by the IRS.  Indeed, the Defendants' own experiences with the IRS in the audit of the "Kenzington Fund" tax returns should have educated them to the fact that as a matter of law the trust structures they promote solely serve a tax-evading purpose and nothing else.   The 2007 injunction obtained against the Defendants' confederate, James DiLullo, further illuminated the illegality of their activities.  Finally, the false representations the Defendants make about the tax benefits of these trusts has a direct, material impact on the tax preparation conduct of their customers, whose tax returns (and the related

17

4575123.1

returns of their trusts) reveal the tax-evading purpose of forming such entities in the first place.

Accordingly, Wycoff and Ozak have violated Section 6700. They have also violated Section 6701, by aiding and abetting the presentation and preparation of numerous false and fraudulent tax returns for the sham trusts they help create, and the customers for whom they are created, and in which such customers misrepresent their proper tax liability to the Government - as underscored by the number of Wycoff and Ozak customers who have been found liable for unpaid taxes in the millions of dollars. (Lee Decl. ¶ 24).

With the first element for obtaining an injunction under Section 7408 satisfied, the Government need only further demonstrate the appropriateness of injunctive relief herein. As set forth in *Estate Preservation Services,* 202 F.3d at 1105, the elements relevant to this inquiry include "(1) the gravity of the harm caused by the offense; (2) the extent of the defendant's participation; (3) the defendant's degree of scienter; (4) the isolated or recurrent nature of the infraction; (5) the defendant's recognition (or non-recognition) of his own culpability; and (6) the likelihood that defendant's occupation would place him in a position where future violations could be anticipated." *See also  Kaun*, 827 F.2d at 1144-45; *Buttorff*, 761 F.2d at 1062.

All of these elements are met. First, the United States has shown a "gravity of harm." The Defendants' promotion of common-law trusts - the false advice they provide, and the encouragement and direct assistance they give customers in setting up and operating sham trusts -  has caused the repeated filing of false Form 1041 and 1040 tax returns by their customers, all of which resulted in the under-reporting and underpaying of the correct amount of taxes to the United States Treasury. The magnitude of harm in just four instances in which the Defendants or their customers with the Defendants' help created, then managed, sham trusts exceeds a million

18

4575123.1

dollars. (Lee Decl. ¶¶ 23-24). Moreover, identifying and recovering all revenues lost from Defendants' misconduct may be impossible, resulting in a permanent loss to the Treasury. The public is also harmed because the IRS is forced to devote its limited resources to identifying and then attempting to recover revenue lost as a result of the Defendants' conduct.

Second, "the extent of the [defendants'] participation" in promotion of the scheme is demonstrated by Wycoff and Ozak's numerous statements, whether made on their website or in The Art of Passing the Buck, admitting the nature of their promotion, as well as their efforts to establish a similar common-law trust for their own behalf, the Kenzington Fund. Third, Wycoff and Ozak's "degree of scienter" is clear: the Defendants appear to devote a large portion of their professional working time to promotion of the so-called common-law trusts - writing and counseling about them as well as assisting in their creation and operation. Anyone who devoted even half the time that the Defendants do to proselytizing the benefits of the trusts they promote would know, or should know, that the trusts have an abusive tax avoidance purpose. This is especially so given the number of times they or confederates like DiLullo have been challenged by the Government and lost.

Fourth, the "recurrent nature of the infraction" is readily evident. As the examples in these motion papers demonstrate, the Defendants have repeatedly falsely told their customers that the formation of a common-law trust is a legal means of "owning nothing, controlling everything" - and enjoying subsequent tax benefits. The recurrent nature of Wycoff and Ozak's infractions is also evident in the striking similarity in the trusts they help establish - all of which feature continued control over the businesses placed into the trusts by the creating taxpayer, under a veneer of management by an "independent" board of trustees.

19

4575123.1

Wycoff and Ozak plainly take no responsibility for their misconduct.  Instead, they blithely insist upon its legality, making frivolous arguments (as exemplified by The Art of Passing the Buck) in support of their positions that no court would find controlling let alone persuasive.  They have also opposed lawful efforts by the IRS to investigate their endeavors, going so far as to initiate baseless administrative or legal proceedings in order to deter IRS scrutiny.  There is no reason to believe that they will voluntarily cease their misconduct absent injunctive relief.

Finally, Wycoff and Ozak's "occupation place[s] [them] in a position where future violations could be anticipated." *Estate Preservation Services,* 202 F.3d at 1105.  Wycoff and Ozak continue to this day to promote their tax-fraud scheme through the creation of sham common-law trusts.  Their website remains active.  When confronted in the past by the IRS, they deny breaking the law while misusing legal process to evade the possibility that the IRS will uncover the truth.  It cannot be concluded that the Defendants will now voluntarily cease their promotion.

Given all of the above, entry of preliminary injunctive relief against Wycoff and Ozak is the appropriate remedy for their illegal conduct.  Federal courts have consistently enjoined promoters of similar sham trusts under Section 7408.  *See, e.g., United States v. Ratfield*, No. 01-8816-CIV-MARRA, 2004 WL 3174420, at *15 (S.D. Fla. Nov. 30, 2004);(enjoining promotion of "pure" trusts under Section 7408); *United States v. Fisher*, No. Civ. 3:03-CV-2108G, 2004 WL 489822, at *4 (N.D. Tex. Jan. 26, 2004)(granting permanent injunction enjoining promotion of establishment of sham trusts for tax benefits); *see also Buttorff*, 761 F.2d at 1059-1065 (affirming determination by district court that marketing of pure equity trust violated Section 6700 and therefore could be enjoined under Section 7408).  The same result is called for here.

4575123.1

## II.    An Injunction Should Issue Based Upon IRC § 7402 to Prevent Defendants from Engaging in Activities that Interfere with the Enforcement of the Internal Revenue Laws.

In addition to its authority to enjoin the Defendants for their tax law violations under Sections 7407 and 7408, this Court is authorized by I.R.C. § 7402 to issue an injunction "as may be necessary or appropriate for the enforcement of the internal revenue laws."  Section 7402 manifests "a Congressional intention to provide the district courts with a full arsenal of powers to compel compliance with the internal revenue laws." *United States v. Hempfling,* No. CV F 05-0594 LJO SMS, 2008 WL 703809, at *14 (E.D. Cal. March 13, 2008), *quoting Brody v. United States*, 243 F.2d 378, 384 (1st Cir. 1957).  Courts have granted injunctive relief under Section 7402 even where the conduct to be enjoined does not specifically violate a particular Tax Code provision. *United States v. Ernst & Whinney*, 735 F.2d 1296, 1300 (11th Cir. 1984); s*ee also Kaun*, 633 F. Supp. at 409 ("federal courts have routinely relied on [§ 7402(a)] . . . to preclude individuals . . . from disseminating their rather perverse notions about compliance with the Internal Revenue laws or from promoting certain tax avoidance schemes"), *aff'd*, 827 F.2d 1144 (7th Cir. 1987).

As is the case with injunctions sought under Sections 7407 or 7408, the Government need not satisfy the "traditional" elements that comprise the test for injunctive relief before such equitable relief will be granted under Section 7402.[4] However, even if this were not the case, injunctive relief under Section 7402 would still be appropriate to prevent the Defendants from continuing to interfere with the

---

4. The Eleventh Circuit stands alone among the Federal Circuit Courts in holding that injunctions sought under Section 7402 must meet the traditional elements for obtaining injunctive relief. *See Ernst & Whinney*, 735 F.2d at 1301.

21

4575123.1

Government's tax enforcement efforts, given the number of persuasive evidentiary factors favoring entry of an injunction when applying the usual test.[5]

The evidence detailed above establishes that the United States is likely to succeed on the merits of its claim that the Defendants are promoting sham trusts as a mechanism for tax avoidance and should therefore be enjoined. Wycoff and Ozak have continually and repeatedly promoted the creation of so-called common-law trusts, assisting their customers in operating them in order to derive the purported associated tax benefits. The examination and audit of the tax returns of such trusts have resulted in the Government determining that the Defendants or their customers owe large tax liabilities plus penalties. At the same time, the Defendants interfere with the enforcement of federal tax laws in other ways, from urging their customers to enter into an "Oath of Silence" intended to screen their misconduct from the Government, to encouraging customers to resist audits and tax return examinations by interposing frivolous legal arguments.

By design Wycoff and Ozak's promotion of common-law trusts and their purported tax benefits interferes with the enforcement of the internal revenue laws by depriving the Government of tax revenue. The Government already calculates (based on review of only a handful of the trusts set up by or for the Defendants) that it has been deprived of more than one million dollars in unpaid taxes due to the Defendants' conduct. The Defendants' activities have thus caused the Government irreparable harm for which existing remedies at law are inadequate, as the Government cannot

5. The traditional injunction requirements also support an immediate permanent injunction against defendants. The four requirements are: (1) a substantial likelihood of success on the merits; (2) a possibility of immediate and irreparable harm if the injunction is not granted; (3) a balance of hardships favoring the plaintiff; and (4) advancement of the public interest." *Save our Sonoran*, *Inc. v. Flowers,* 408 F.3d 1113, 1120 (9th Cir. 2005).

22

4575123.1

successfully recover all revenue it was deprived of through Wycoff and Ozak's promotion of common-law trusts. Injunctive relief under Section 7402 is therefore necessary and appropriate to prevent the Defendants from continuing to promote practices that amount to a raid on the U.S. Treasury.

The balance of hardships also favors the United States. A preliminary injunction order will merely preclude the Defendants from further engaging in illegal activity while this case is pending. *See Dunlop v. Davis*, 524 F.2d 1278, 1281 (5th Cir. 1975) (finding that injunctions requiring people to follow the law do not cause hardship). The United States, by contrast, has already devoted substantial resources to investigating the Defendants, auditing their customers, and then attempting to bring them into compliance with the tax laws. Denial of injunctive relief would only perpetuate the harm of Defendants' misconduct but also obligate the U.S. to devote ever more precious resources to preventing the growth of the Defendants' scheme. Refusal to enjoin the Defendants' misconduct would also thwart the purpose of Section 7402, which expressly permits the Government to require compliance with the Internal Revenue laws.

Finally, the public interest is served by preventing Defendants' illegal conduct, the impact of which extends beyond their customers to the public at large. Protecting the public from the promotion of fraudulent tax-avoidance scams is a strong governmental interest. *United States v. Lee*, 455 U.S. 252, 253 (1982) (noting that "the broad public interest in maintaining a sound tax system is of . . . a high order"). In this case, an injunction is the most effective means of meeting such important policy goals.

## III. An Injunction Will Not Infringe Upon the Defendants' First Amendment Rights.

The First Amendment prohibits the Government from abridging freedom of speech (U.S. Const. Amend. I), but this prohibition is not unlimited with respect to

23

4575123.1

commercial speech  –  "expression related solely to the economic interests of the speaker and its audience."   *United States v. Schiff*, 379 F.3d 621, 626-27 (9th Cir. 2004) (quoting *Central Hudson Gas & Electric v. Public Serv. Comm'n*, 447 U.S. 557, 561 (1980)).  Rather, false or fraudulent commercial speech that deceives the public or is related to unlawful activity receives no protection and may be properly subjected to government regulation.  *See Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983)*; Schiff*, 379 F.3d at 626 (quoting *Central Hudson*, 447 U.S. at 561); *United States v. Bell*, 414 F.3d 474, 483-83 (3rd Cir. 2005) (defendant's tax advice enjoys no First Amendment protection and may be restrained because it is false commercial speech).

Although it is true that The Art of Passing the Buck contains many statements that reflect political beliefs, however frivolous (such as the idea that the IRS is based in Puerto Rico)[6], the Defendants' promotion of sham common-law trusts constitutes just the sort of false commercial speech that can be, and has been, enjoined based upon the Internal Revenue laws.  In determining if speech is commercial, courts consider (a) whether the speech is an advertisement, (b) whether it refers to a specific product, and (c) if the speaker has an economic motivation for the speech.  *Bolger*, 463 U.S. at 66-67.

6.  Of course, the mere fact that otherwise commercial speech is tinged with or motivated by political belief does not immunize such speech from regulation.  In *Bell*, for example, the Third Circuit found that "packing a commercial message with token political commentary does not insulate commercial speech from appropriate restrictions."  *See Bell*, 414 F.3d at 480 n.6 (when customers paid a tax preparer for his advice and services in preparing fraudulent returns, it was not for his colorful views on the tax code, and no complex mixture of commercial and political speech existed). Here, the  thrust of the Defendants' message in The Art of Passing the Buck is to promote a commercial end: the use of their services in establishing common-law trusts.  And, as in the case of the Serbans or Rex Wilson, this is precisely what occurred when the Defendants' views were accepted by customers.

24

Here, the Government seeks to enjoin the Defendants to the extent they make false statements about the tax benefits of common-law trusts in connection with their sale of their services to create such trusts. This type of speech, besides being patently false (for the reasons set forth above) is in aid of the Defendants' sale of their services. As in *Schiff*, the Defendants rely on false assertions of the legality of the trusts to promote their services, to the detriment of their customers. *Schiff,* 379 F.3d at 630 ("an advertisement is fraudulent when it misleads its customers about the benefit of the offered product;" based on numerous fraudulent comments in Schiff's book, "the risk of consumer confusion" was great and the district court did not abuse its discretion when it enjoined). And the Defendants' goal (as the end-pages of The Art of Passing the Buck plainly indicate) is to persuade customers to seek, for a fee, their advice in setting up and then running common-law trusts. Accordingly, the Government properly seeks to prohibit the Defendants from engaging in unprotected false commercial speech.

## CONCLUSION

Given the inescapable conclusion that Wycoff and Ozak are promoting the creation of sham trusts intended to subvert the Internal Revenue laws, and will continue to do so absent court action, a preliminary injunction against the Defendants under IRC §§ 7402 and 7408 is amply warranted.

25

October 8, 2010

Respectfully submitted,

ANDRÉ BIROTTE, JR.
United States Attorney

SANDRA R. BROWN
Assistant United States Attorney
Chief, Tax Division

DARWIN THOMAS
Ca. Bar No. 80745
Assistant United States Attorney
Federal Building, Room 7211
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-2740
Facsimile:   (213) 894-0115
Email: darwin.thomas@usdoj.gov

/s/ Brian H. Corcoran
BRIAN H. CORCORAN
Member, D.C. Bar, No. 456976
Admitted *Pro Hac Vice*
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 7238
Washington, D.C.  20044
Telephone: (202) 353-7421
Fax: (202) 514-6770
Brian.H.Corcoran@usdoj.gov

26

4575123.1