ANDRE´ BIROTTE, JR.
United States Attorney

SANDRA R. BROWN
Assistant United States Attorney
VALERIE MAKAREWICZ
Assistant United States Attorney
Federal Building, Room 7211
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-2729
Facsimile:   (213) 894-0115
E-mail: Valerie.Makarewicz@usdoj.gov

BRIAN H. CORCORAN
(D.C. Bar No. 456976)
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 7238
Washington, D.C.  20044
Telephone: (202) 353-7421
Facsimile: (202) 514-6770
E-mail: brian.h.corcoran@usdoj.gov

Attorneys for Plaintiff the United States

IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,        ) | |
|         Plaintiff,        ) | |
|     v.        ) | Civil No. |
| GWENN WYCOFF, and        ) | **Declaration of Fred Chynoweth** |
| FRANK OZAK,        ) | |
|         Defendants.        ) | |

I, Fred Chynoweth, declare as follows:

1.    I have been employed as a revenue agent at the Internal Revenue Service ("IRS") since 1974.  Until January 2010, I worked in the Small Business/Self-Employed Division in Bakersfield, California.  I am presently a Revenue Agent in the Large and Midsize Business Division.

4595323.1

2. As part of my duties as revenue agent, in 2005 I was assigned to conduct an examination of the income tax returns relating to Rita and George Serban of Bakersfield, California. The statements I make in this declaration are based upon my investigation, my review of tax returns and other materials relating to the examinations I conducted, and my experience as a revenue agent.

3. In the late 1990s, the Serbans began exploring means of protecting their assets and income from federal taxation. Through the assistance of their certified public accountant, Gary Tedder, they learned of the Kenzington Fund, and specifically Gwenn Wycoff and Frank Ozak, and the trust arrangements they promoted.

4. In 1998, Wycoff and Ozak helped the Serbans set up three related trusts: the Solomon Nabres Family Trust, the Solomon Family Trust, and the Hagar Family Trust. Rita Serban was established as the three trusts' Executive Secretary, and George Serban their General Manager.

5. Income and assets relating to the Serbans' business (which installed audio broadcasting equipment in schools and businesses) were allocated and assigned to the trusts. These trusts in turn purportedly invested the monies, maintained the assets and properties they held, and made distributions of their income to both Serban family members as well as additional entities.

6. Although Mr. Tedder participated in the creation of the Serban trusts, my investigation revealed that the Kenzington Fund, and Wycoff and Ozak individually, were also heavily involved. The Kenzington Fund received payments from the Serbans for its initial assistance in the trusts' creation. Ms. Wycoff and Mr. Ozak attended quarterly and yearly trustee meetings of each trust, and were compensated for this involvement. (A true copy of the minutes from the Board of Trustee's meeting for the Solomon Family Trust, dated February 27, 2006, is attached as Exhibit A).

- 2 -

4595323.1

7. In addition, the Kenzington Fund recommended to Mr. Tedder that they use James DiLullo to assist them with the tax returns for the trusts. DiLullo in fact reviewed and filed the trusts's Form 1041 income tax returns until 2004. They also recommended Mr. DiLullo as a potential source of good off-shore investments for trust proceeds. To that end, the Serbans listed an entity associated with DiLullo, Equity Management Trust ("EMT"), as a minor beneficiary of the trusts, although ultimately the Serbans did not opt to have the trusts make such investments.

8. My investigation revealed that at a certain point Mr. Tedder learned that DiLullo was ignoring correspondence from the California State Franchise Board about some of the tax returns he had prepared for the Serbans' trusts, after which they opted to cease having DiLullo prepare their trust tax returns. DiLullo has himself been enjoined by a federal district court from promoting tax evasion schemes.

9. After I began my investigation and issued administrative summonses to the Serbans and their CPA, I received correspondence from all summoned parties involved directly in the trusts containing what I considered to be standard tax defier frivolous arguments and blanket refusals to cooperate. Ultimately, the IRS was able to obtain compliance with the summonses through a court order. After I interviewed Mr. Tedder, I learned that the arguments the Serbans had made in opposing the summonses were directly obtained from a paralegal whom Wycoff and Ozak had recommended to him and the Serbans.

10. Through my investigation, I learned that, contrary to the purported ownership and control the Serban trusts maintained over their income and assets, in fact taxpayer George Serban had significant control at all times over the activities of the trust, including but not limited to check signing authority, management of the trusts's operations, attendance at all trustee meetings, and direction of the

- 3 -

4595323.1

disposition of trust income, including investment decisions. By contrast, it appeared the other trustees (among whom were the Serbans's daughter and their priest) had nominal involvement in decision-making with respect to the trusts.

11. Another suspicious aspect of the Serban trusts that I discovered in the course of my investigation was the fact that the entities associated with the trusts appeared upon close examination to be fictitious. For example, trust beneficiary EMT had an off-shore address that, upon checking, did not exist for that entity. Similarly, an entity called "Noble Trust Services Company" was identified in one of the trusts' 2002 income tax returns as having a Bahamas post office box that could not be confirmed by the U.S. Postal Service upon request. I later learned this was yet another entity associated with DiLullo.

12. In addition, the instruments creating the various Serban trusts were themselves written in unnecessarily (but perhaps purposefully) complex language, making them extremely difficult to understand and interpret. As a result, the tax returns prepared for the trusts often did not reflect accurately how the trusts specified that certain matters should be managed.

13. For example, the trust documents had been drafted to indicate the transfer, without consideration, of various assets owned by George and Rita Serban to a variety of entities that were termed as "holding trusts." Each such holding trust had different combinations of family members as beneficiaries. Those trusts did not file returns, but had been provided ownership "units" by the documents creating the Solomon Nabres Family Trust. Money was transferred from the Serbans's underlying business to Solomon Nabres Family Trust as rent for use of some of the assets. The rent payments were, however, reported on the Schedules E for the tax returns of either the Solomon Nabres or Solomon Family Trust, depending on the year filed. No appraisal was obtained for the value of the rented property, and it appeared rent payments were often in

- 4 -

4595323.1

arrears. As a result, the information with respect to such transactions as reported on the filed returns for the trusts could not be reconciled with the directives of the trust documents themselves.

14. No trustee could reconcile the purported income distributions as reported on the trusts' tax returns with the trust documents. The return for the Solomon Nabres Family Trust, for example, reported that 85 percent of its income had been distributed to EMT. This in fact had not occurred; rather, the money received by the Solomon Nabres Family Trust was primarily deposited into a bank account in its own name.

15. I participated directly in the IRS audit of the tax returns filed for the Serbans' trusts as well as the Serbans' individual income tax returns from year 2001 to 2005. I determined that all three trusts were shams, but the IRS ultimately settled with the Serbans through the administrative appeals process. As a result of the audits and investigation, George and Rita Serban agreed to tax deficiencies and penalties in excess of $900,000.00. A copy of the July 10, 2009 stipulation relating to the Serbans's agreed-upon tax liabilities is attached as Exhibit B).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May   , 2010

Fred Chynoweth

- 5 -

4595323.1