ANDRÉ BIROTTE
United States Attorney

SANDRA R. BROWN
Assistant United States Attorney
DARWIN THOMAS
Ca. Bar No. 80745
Assistant United States Attorney
Federal Building, Room 7211
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-2740
Facsimile:   (213) 894-0115
E-mail:darwin.thomas@usdoj.gov

BRIAN H. CORCORAN
Member, D.C. Bar, No. 456976
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 7238
Washington, D.C. 20044
Telephone: (202) 353-7421
Facsimile: (202) 514-6770
E-mail: brian.h.corcoran@usdoj.gov

Attorneys for Plaintiff, United States

IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA,                )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )   Civil No.  CV-10-5856-JHN (PLAx)
                                         )
GWENN WYCOFF, and                        )   **Declaration of George Serban**
FRANK OZAK,                              )
                                         )
                    Defendants.          )

I, George Serban, hereby declare as follows:

1.    I reside in Bakersfield, California with my wife, Rita Serban.  My wife and I had a profitable business that we jointly owned and operated until we sold it in 2005.  This business installed audio and public address equipment.

2. We have long been concerned with protecting our assets and income, as well as making sure that our financial holdings are preserved for our family or invested profitably. As a result, we have on two occasions attempted to create trusts that would help us protect and maintain our financial holdings for our future familial generations.

3. In the late 1990s, our certified public accountant, Gary Tedder, told us about the common-law trust arrangements promoted by Gwenn Wycoff and Frank Ozak. Based upon his recommendation, we had a meeting with Wycoff and Ozak in Bakersfield in or around November of 1998 to discuss the nature of these trusts. Mr. Tedder had been our accountant for many years and we trusted his judgment.

4. At the November 1998 meeting, Tedder, Wycoff, and Ozak informed my wife and I that the trust they were urging us to create was not a grantor trust, but was otherwise legal. They also informed us that after we transferred any of our assets or possessions into the trust, they would no longer be owned by us personally from a legal standpoint (although we would have input into the trust's business).

5. After our meeting, my wife and I decided we would retain Wycoff and Ozak to help us set up some trusts. In early 1999, we paid the two of them approximately $10,000 to prepare the paperwork necessary to establish the trusts and to assist Mr. Tedder with their operation. Our goal was to establish trusts that would follow our wishes as stated in the trust indenture. Wycoff and Ozak (as well as our accountant) informed us that common law allowed us to do this.

6. Our initial intent in setting the trusts up was not to realize tax benefits but instead to protect our assets, although we later learned from Wycoff and Ozak that there were in fact some tax benefits to be realized from common-law trusts.

- 2 -

We also believed, based on what Tedder, Wycoff, and Ozak told us, that these tax benefits were legal based upon applicable IRS regulations and court cases. Indeed, we were specifically shown court cases and IRS regulations that we were told established the legality of these purported tax benefits.

7. Wycoff and Ozak specifically set up three related trusts for us. Our home, financial assets, and personal property were all placed into separate, but related, trusts. A building we used to operate our business was also placed into one of the trusts. We continued to manage the businesses ourselves, however.

8. In establishing these trusts, Tedder, Wycoff, and Ozak informed us that we would need trustees appointed to run the trusts. During the time the trusts were in operation, some individuals with whom we were acquainted, such as Mr. Tedder, served as trustees. My wife acted as our trusts' Executive Secretary (and was responsible for preparing the trust board meeting minutes), while I was their General Manager. Wycoff and Ozak held the positions of trust protectors, for which they received compensation in the amount of about $400 a year from 2005 until 2009.

9. In initiating the trusts, Wycoff and Ozak informed us that it was very important that all trust trustees, managers, and others possessing knowledge of trust business respect the privacy of trust matters. To that end, an "Oath of Privacy" was incorporated in the documents initiating the trust that bound us and all other individuals responsible for the trusts from discussing trust business with others. There were financial penalties in the event this oath were to be breached.

10. After the trusts were set up, we held quarterly and yearly trustee meetings. Wycoff and Ozak traveled to Bakersfield numerous times between 1998 (the year the trusts were established) and 2007. We once traveled to Burbank, California for a trust meeting at which Tedder, Wycoff, and Ozak conducted a

- 3 -

workshop for our trusts' trustees and beneficiaries. In all respects, Wycoff and Ozak were compensated for their travel expenses in attending such meetings.

11. Because of our roles in the trusts, we were at all times aware of the activities of the trusts (although we did not always understand the reason for certain action urged upon us by Tedder, Wycoff, and Ozak).

12. Over time, a number of occurrences led my wife and me to question the advice we were receiving from Wycoff and Ozak - either directly or through our accountant. For example, at one point we were informed that Wycoff and Ozak wanted us to consider investing our trust proceeds in some off-shore entity. We chose not to make this investment because it could not be adequately explained to us. Also, and at the urging of Tedder, Wycoff, and Ozak, we paid Mr. James DiLullo to review and sign the trust income tax returns prepared by Mr. Tedder. We were never informed, however, why this review was necessary.

13. In addition, we had trouble reconciling, from an accounting perspective, what was being done with trust proceeds, and Mr. Tedder could not adequately explain to me why in some instances the trusts were directing funds toward certain entities, such as various d/b/a's of Mr. DiLullo.

14. Wycoff and Ozak also advised us that our trusts could legally report, in K-1 filings, that we had made financial disbursements to certain trust beneficiaries or entities without in fact making actual distributions to those entities. We were specifically told, for example, that we could distribute to Mr. DiLullo (who was at one point a designated beneficiary of one of the trusts) one percent of the sum we reported on a K-1 as having distributed to him. (We made sure, however, when making distributions to our children and other immediate family, that they received the amounts we reported as having distributed to them, and they paid federal taxes on those distributions).

- 4 -

15. Eventually, in 2005 we learned that the IRS was auditing the trusts as well as our individual tax returns. When we informed Wycoff and Ozak of this fact, they recommended that we fight the IRS and put us in contact with an individual by the name of David Manning. Although he was not an attorney, we were informed that Mr. Manning was a self-taught expert in IRS investigation of common-law trusts and would be able to assist us in dealing with the IRS audit. We ended up making Mr. Manning a trustee, and paid him close to $40,000 for the assistance he provided us.

16. Mr. Manning began sending the IRS numerous correspondence, and making other written filings, to counter the audit. After time, we realized that his efforts were not only not resolving the problem but were in fact making things worse. We also learned that Wycoff and Ozak themselves were dealing with IRS investigations of their own. We therefore decided that we would stop using Mr. Manning and would instead hire an actual attorney to assist us in the IRS investigation.

17. After completion of the audit process, we settled with the IRS and agreed to pay the Government hundreds of thousands of dollars in additional unpaid taxes. Even though the audit process did not result in a formal determination that the trusts we had created were illegal, due to our increasing sense that there were problems with the trusts urged upon us by Tedder and set up by Wycoff and Ozak, we determined once the audit was over that we would shut down all of the trusts, and we did so in 2009.

18. I am very disappointed with the advice we received from Wycoff and Ozak (as well as Tedder) about the legality of the trusts. My wife and I assumed and understood that the advice Wycoff and Ozak gave us was correct as well as legal. I now understand that was not the case, and I would never again consider

- 5 -

listening to anything Wycoff, Ozak, or Tedder might tell us about common-law trusts, nor would I recommend their services to any other individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 15, 2010

George Serban